Robert S. Meloni, Esq.
MELONI & MCCAFFREY LLC
3 Columbus Circle, 15th Floor
New York, New York 10019
Email: rmeloni@m2lawgroup.com

*Attorneys for Defendant and Counterclaimant Dionne Warwick*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARTISTS RIGHTS ENFORCEMENT CORPORATION, <br><br>            Plaintiff, <br><br>     -against- <br><br> DIONNE WARWICK, <br><br>            Defendant. | Civ. Action No. 1:25-cv-10381 <br><br><br> **ANSWER AND AFFIRMATIVE DEFENSES** |
| DIONNE WARWICK, <br><br>            Counterclaim Plaintiff, <br><br>     -against- <br><br> ARTISTS RIGHTS ENFORCEMENT CORPORATION, <br><br>            Counterclaim Defendant. | **COUNTERCLAIMS** <br><br><br> **DEMAND FOR JURY TRIAL** |

Defendant, DIONNE WARWICK, by her attorneys, Meloni & McCaffrey LLC, as and for her Answer, Affirmative Defenses and Counterclaims, responds as follows:

## GENERAL DENIAL

Except as otherwise expressly stated herein, Defendant (1) generally denies each and every allegation in the Complaint, including, without limitation, any allegations contained in the introduction, headings, subheadings and unnumbered paragraphs of the Complaint; (2) specifically denies that it has caused Plaintiff to suffer any harm, losses, or damages; (3) denies any liability to

Plaintiff; and (4) declines to adopt or acknowledge as accurate any defined terms in the Complaint to the extent they constitute allegations directed at Defendant. Defendant reserves the right to challenge the authenticity of all sources and documents referred to or purportedly quoted from in the Complaint, and to assert that any of the sources or documents referred to or purportedly quoted from by Plaintiff in the Complaint are covered by the attorney-client privilege, the work product doctrine, and/or otherwise applicable privileges. Defendant reserves the right to seek to amend or supplement her Answer as may be necessary or appropriate.

## <u>RESPONSES TO GENERAL ALLEGATIONS</u>

1.    To the extent the allegations in paragraph 1 contain legal conclusions, opinions, Plaintiff's characterization of its legal claims, and Plaintiff's definitions of terminology, no response is required. To the extent any response is required, Defendant denies the allegations of paragraph 1 in their entirety.

2.    To the extent the allegations in paragraph 2 consist of legal conclusions and Plaintiff's characterization of its legal claims, no response is required. To the extent a response is required, Defendant denies the allegations of paragraph 2.

3.    Defendant is without sufficient knowledge and information to either admit or deny the allegations of paragraph 3 and, therefore, denies same.

4.    Defendant admits the allegations of paragraph 4.

5.    To the extent the allegations in paragraph 5 consist of legal conclusions and Plaintiff's characterization of its legal claims, no response is required. To the extent a response is required, Defendant admits that this Court has subject matter jurisdiction over the purported claims in the Complaint.

6.    To the extent the allegations in paragraph 6 consist of legal conclusions and Plaintiff's characterization of its legal claims, no response is required. To the extent a response is required, Defendant denies the allegations of paragraph 6.

7.    To the extent the allegations in paragraph 7 consist of legal conclusions and Plaintiff's characterization of its legal claims, no response is required. To the extent a response is required, Defendant states that she does not dispute venue in this District.

8.    Defendant is without sufficient knowledge and information to either admit or deny the allegations of paragraph 8 and, therefore, denies same.

9.    Defendant admits the allegations of paragraph 9.

10.    To the extent the allegations in paragraph 10 consist of legal conclusions and Plaintiff's characterization of its legal claims, no response is required. Defendant respectfully refers the Court to the agreements referenced in subparagraphs 10(a), (b), (c) and (d) for their full content, purpose and intent. To the extent a response is otherwise required, Defendant denies the allegations of paragraph 10.

11.    To the extent the allegations in paragraph 11 consist of legal conclusions and Plaintiff's characterization of its legal claims, no response is required. To the extent a response is required, Defendant denies the allegations of paragraph 11, except admits that she was due monies from Phonographic Performance Limited.

12.    To the extent the allegations in paragraph 12 consist of legal conclusions and Plaintiff's characterization of its legal claims, no response is required. Defendant respectfully refers the Court to the agreement attached to the Complaint as Exhibit 1 for its full content, purpose and intent. To the extent a response is otherwise required, Defendant denies the allegations of paragraph 12.

13. To the extent the allegations in paragraph 13 consist of legal conclusions and Plaintiff's characterization of its legal claims, no response is required. Defendant respectfully refers the Court to the complaint filed on March 3, 2002 in the United States District Court for the Southern District of New York in the action entitled *Warwick v. Warner Products, et al* (Case No. 1:02-cv-01741-GEL) for its full content, purpose and intent. To the extent a response is otherwise required, Defendant denies the allegations of paragraph 13.

14. To the extent the allegations in paragraph 14 consist of legal conclusions and Plaintiff's characterization of its legal claims, no response is required. Defendant respectfully refers the Court to the March 31, 2004 settlement agreement for its full content, purpose and intent. To the extent a response is otherwise required, Defendant denies the allegations of paragraph 14.

15. Defendant is without sufficient knowledge and information to either admit or deny the allegations of paragraph 15 and, therefore, denies same.

16. Defendant is without sufficient knowledge and information to either admit or deny the allegations of paragraph 16 and, therefore, denies same.

17. To the extent the allegations in paragraph 17 consist of legal conclusions and Plaintiff's characterization of its legal claims, no response is required. Defendant respectfully refers the Court to the 2017 Sound Exchange agreement attached to the Complaint as Exhibit 2 for its full content, purpose and intent. To the extent a response is otherwise required, Defendant denies the allegations of paragraph 17.

18. Defendant is without sufficient knowledge and information to either admit or deny the allegations of paragraph 18 and, therefore, denies same.

19. Defendant is without sufficient knowledge and information to either admit or deny the allegations of paragraph 19 and, therefore, denies same.

20.  To the extent the allegations in paragraph 20 consist of legal conclusions and Plaintiff's characterization of its legal claims, no response is required. Defendant respectfully refers the Court to the "original January 9, 2002 Agreement" for its full content, purpose and intent. To the extent a response is otherwise required, Defendant denies the allegations of paragraph 20.

21.  Defendant is without sufficient knowledge and information to either admit or deny the allegations of paragraph 21 and, therefore, denies same.

22.  Defendant is without sufficient knowledge and information to either admit or deny the allegations of paragraph 22 and, therefore, denies same.

23.  Defendant is without sufficient knowledge and information to either admit or deny the allegations of paragraph 23 and, therefore, denies same.

24.  Defendant is without sufficient knowledge and information to either admit or deny the allegations of paragraph 24 and, therefore, denies same.

25.  Defendant denies the allegations of paragraph 25.

26.  To the extent the allegations in paragraph 26 consist of legal conclusions and Plaintiff's characterization of its legal claims, no response is required. Defendant admits that on or about September 16, 2025, her counsel sent a letter to Plaintiff and respectfully refers the Court to that letter for its full content, purpose and intent. To the extent a response is otherwise required, Defendant denies the allegations of paragraph 26.

27.  To the extent the allegations in paragraph 27 consist of legal conclusions and Plaintiff's characterization of its legal claims, no response is required. Defendant admits her counsel sent letters to Rhino, Sony and PPL and respectfully refers the Court to those letters for their full content, purpose and intent. To the extent a response is otherwise required, Defendant denies the allegations of paragraph 27.

## RESPONSE TO THE FIRST CAUSE OF ACTION
### (Declaratory Judgment)

28.  Defendant re-alleges each of her responses to the allegations contained in paragraphs 1 through 27 above as if fully set forth herein.

29.  Defendant denies the allegations contained in paragraph 29.

30.  Defendant denies the allegations contained in paragraph 30.

31.  Defendant lacks knowledge or information sufficient to form a belief as to the truth of Plaintiff's allegation that a justiciable controversy exists for purposes of declaratory relief and therefore denies the in paragraph 31.

32.  To the extent the allegations in paragraph 32 consist of legal conclusions and Plaintiff's characterization of its legal claims, no response is required. To the extent a response is otherwise required, Defendant denies the allegations of paragraph 32.

## RESPONSE TO SECOND CAUSE OF ACTION
### (Breach of Contract)

33.  Defendant re-alleges each of her responses to the allegations contained in paragraphs 1 through 32 above as if fully set forth herein.

34.  Defendant denies the allegations contained in paragraph 34.

35.  Defendant denies the allegations contained in paragraph 35.

36.  Defendant denies the allegations contained in paragraph 36.

37.  There is no paragraph 37 in the Complaint, therefore no response is required.

## RESPONSE TO THIRD CAUSE OF ACTION
### (Unjust Enrichment)

38.  Defendant re-alleges each of her responses to the allegations contained in paragraphs 1 through 37 above as if fully set forth herein.

39.   Defendant is without sufficient knowledge and information to either admit or deny the allegations of paragraph 39 and, therefore, denies same.

40.   To the extent the allegations in paragraph 40 consist of legal conclusions and Plaintiff's characterization of its legal claims, no response is required. To the extent a response is otherwise required, Defendant denies the allegations of paragraph 40.

41.   Defendant denies the allegations contained in paragraph 41.

### SPECIFIC AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE
**(Failure to State a Claim)**

The Complaint and any purported claims for relief therein fail to state a claim as a matter of law.

### SECOND AFFIRMATIVE DEFENSE
**(Statute of Limitations)**

The Complaint and any purported claims for relief therein are barred, precluded, and/or limited by the statute of limitations.

### THIRD AFFIRMATIVE DEFENSE
**(Waiver)**

The Complaint and any purported claims for relief therein are barred, precluded, and/or limited by the doctrine of waiver.

### FOURTH AFFIRMATIVE DEFENSE
**(Estoppel)**

The Complaint and any purported claims for relief therein are barred, precluded, and/or limited by the doctrine of estoppel.

### FIFTH AFFIRMATIVE DEFENSE
**(Unclean Hands)**

The Complaint and any purported claims for relief therein are barred by the Plaintiff's unclean hands.

## SIXTH AFFIRMATIVE DEFENSE
### (Absence of Breach by Defendant)

Plaintiff's claims are barred, in whole or in part, because, to the extent there was an

agreement, Defendant has not breached any contractual duty.

## SEVENTH AFFIRMATIVE DEFENSE
### (Plaintiff's Breach of Contract)

Plaintiff's claims are barred, in whole or in part, because, to the extent there was an

agreement, Plaintiff has materially breached its contractual duties.

## EIGHTH AFFIRMATIVE DEFENSE
### (Indefinite Duration – At Will Relationship)

Plaintiff's claims are barred, in whole or in part, because the purported January 9, 2002

Agreement alleged does not constitute an enforceable contract. The January 9, 2002 Agreement

does not specify a definite term or duration. Because no fixed duration is specified, the alleged

contractual relationship is presumptively terminable at will, and Plaintiff cannot recharacterize

the arrangement as a fixed-term contract absent a showing that the parties agreed to a fixed

duration bounded by legally and realistically cognizable limits.  To the extent Plaintiff seeks to

impose liability premised on a supposed promise of ongoing commission entitlement for an

indefinite period, that theory conflicts with the at-will presumption and fails absent an express

contractual limitation on Defendant's right to terminate the relationship.

## TENTH AFFIRMATIVE DEFENSE
### (Failure to Mitigate)

Plaintiff has failed to mitigate any of its damages.

## RESERVATION OF RIGHTS

Upon further investigation and/or discovery, Defendant may have additional affirmative

defenses to Plaintiff's claims. Accordingly, Defendant reserves the right to add to, delete or

modify the affirmative defenses contained in this Answer, and to amend these affirmative defenses to conform to proof at trial.

**WHEREFORE**, Defendant demands judgment dismissing each individual Count of the Complaint in part and/or in their entirety with prejudice on the merits, awarding Defendant her costs and expenses of this action including her reasonable attorneys' fees, and granting the Defendant such other, further and different relief as the Court may deem just and proper.

March 9, 2026

Yours, etc.

MELONI & McCAFFREY LLC
3 Columbus Circle, 15th Floor
New York, New York 10019
Tel: (917) 331-9556

*Attorneys for Defendant Dionne Warwick*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DIONNE WARWICK,<br><br>                            Counterclaimant,<br><br>      -against-<br><br>ARTISTS RIGHTS ENFORCEMENT CORPORATION,<br><br>                     Counterclaim-Defendant. | **COUNTERCLAIMS** |

Defendant and Counterclaimant, Dionne Warwick (hereinafter referred to as "Ms. Warwick" or Counterclaimant"), by her undersigned attorneys, hereby alleges, as and for her Counterclaims against Plaintiff and Counterclaim-Defendant Artist Rights Enforcement Corporation (hereinafter referred to as "AREC" or "Counterclaim-Defendant"), as follows:

## INTRODUCTION

> "*Beware of false prophets. They come to you in sheep's clothing,*
> *but inwardly they are ferocious wolves. By their fruit you will recognize them.*"  [1]

1.      Aesop's fable "The Wolf in Sheep's Clothing" (*circa* Sixth Century B.C.) is a cautionary tale that has particular relevance to the present dispute between Counterclaimant, beloved musical artist Dionne Warwick, and Counterclaim-Defendant AREC, a company formed in 1977 by the late Chuck Rubin. Since his death in 2020, his daughter, attorney Gabin Rubin has been its sole owner and served as its CEO and, upon information and belief, since at least 2001, has acted as AREC's General Counsel.

---

[1] Aesop's Fable *A Wolf in Sheep's Clothing* is an idiom derived from Jesus on Nazareth's Sermon on the Mount as narrated in the Gospel of Matthew, 7:15: "Beware of false prophets, which come to you in sheep's clothing,  but inwardly they are ravening wolves." He warned his followers to beware those who cloak themselves in the garments of virtue while harboring self-serving designs.

2.    AREC professes to help artists secure fair compensation for their creative work, negotiate settlements, and "fight to make your music yours again."[2] AREC's client list primarily consists of legacy artists – established musicians past the peak of their careers  whose reputation, catalogs, and influence continue to generate value.

3.    As explained below, however, AREC more closely resembles Aesop's proverbial Wolf,  cloaking itself in professional credibility while concealing its own self-interest.

4.    Through these counterclaims, Ms. Warwick seeks to expose AREC's performative ethics and vindicate her rights and obtain restitution for the damages caused by AREC's decades-long pilfering of millions of dollars in royalty income she earned as a result her legendary recordings, including  "Walk On By," "I Say a Little Prayer," "I'll Never Fall in Love Again," "That's What Friends Are For," "Do You Know the Way to San Jose," and "Alfie," among many others.

5.    At issue in this case is AREC's standard one-page form agreement with Ms. Warwick. The agreement provides that AREC is entitled to  an  "on-going " commission of 50% of  "all sums and assets which are recovered as a proximate result of [AREC's] activities on [Artist's]behalf."  AREC has used this same agreement with numerous other legacy artists over the years, and it has been the subject of multiple lawsuits brought both by and against AREC.

6.    As Ms. Warwick's agent, AREC is, by definition, Ms. Warwick's fiduciary.

7.    Gabin Rubin, has been an officer, principal, general counsel of AREC for many years, including the entire time it has claimed to operate as Ms. Warwick's agent. She has been a licensed attorney since 1995 and, as such, owes an even higher fiduciary duty to AREC's clients, including Ms. Warwick.

---

[2] https://www.datanyze.com/companies/artists-rights-enforcement/346893828?utm_source=chatgpt.com

## JURISDICTION AND VENUE

8.    This Court has original and exclusive subject matter jurisdiction over this action

pursuant to 28 U.S.C. § 1338(a)(1) because the amount in controversy exceeds the sum of

$75,000, exclusive of interest and costs, and complete diversity of citizenship exists between the

parties.

9.    Venue is proper in the Southern District of New York under 28 USC §1391 because

the Counterclaim-Defendant is subject to personal jurisdiction and/or is doing business, and

since the acts complained of occurred or originated in this District.

## PARTIES

10.    Counterclaimant Dionne Warwick ("Ms. Warwick") is an individual who resides in

the State of New Jersey. She is an American singer, actress, and television host and one of the

top-selling female vocalists of all time, having over 75 charted hit songs. Her career spans more

than six decades and she continues to perform and be involved in music and public life today.

11.    Ms. Warwick has received numerous honors and awards throughout her long career

in music and philanthropy, including 6 Grammy Awards and a Grammy Lifetime Achievement

Award. She is an American Music Awards recipient, a Billboard Music Awards recipient,  a

Rock & Roll Hall of Fame Inductee, a Kennedy Center Honoree, a Hollywood Walk of Fame

Star recipient, a NAACP Image Awards recipient, and a United Nations Global Ambassador for

Health.

12.    Plaintiff and Counterclaim-Defendant Artist Rights Enforcement Corporation

("AREC") is a business corporation organized in 1981 under the laws of New York, with its

principal place of business located at 1776 Broadway, Suite 1001, New York, NY.

13.    AREC's services consist of rendering services, both business and legal in nature, to its artist clients, such as assisting in securing and collecting royalties, fees, and other income streams owed to them from the exploitation of their recordings and compositions, pursuing royalty claims, obtaining accounting statements, and enforcing rights against record labels, music publishers or other entities that exploit musical works. It also negotiates settlement agreements on behalf of those artists with those music companies and, where necessary, supervises litigation its artists institute to enforce contracts and recover royalties.

14.    The services typically rendered by AREC are not that dissimilar from what music business attorneys customarily render to their clients. Even so, New York attorneys who operate a commercial business that render purely business advice are nevertheless subject to the New York Rules of Professional Conduct and the ethical obligations imposed on attorneys practicing in this State, regardless of whether the attorney is engaged in traditional legal practice or other professional or business activities, or a combination of the two.

## SUMMARY OF FACTS

15.    In 2001, Ms. Warwick enlisted the aid of AREC to address problems with the non-payment of record royalties she was owed from the sale of her earliest recordings that were originally distributed by Scepter Records and later distributed by Warner Bros. Records, as alleged in more detail below.

16.    On November 26, 2001, AREC entered into a one-page agreement with Ms. Warwick pursuant to which she retained AREC to use its "best efforts" to "act on [Ms. Warwick's] behalf in connection with the investigation into and collection and/or recovery of any and all royalties and/or other assets which are or may be due and owing to [Ms. Warwick's] as a Scepter Records recording artist" (the "2001 Agreement").

17.    The 2001 Agreement also provided as follows:

> It is my understanding that you are to use your best efforts to obtain from record companies, and all others who are or may be liable to me, as well as any other persons or entities acting in concert with them, an accounting for and collection of such royalties and other rights, which, arising out of my business or contractual relations with such parties, are or may be due me from the manufacture, sale, publication, use, or distribution of phonorecords, CD's, tapes, videos, performances, publications, or any other such use or dissemination of my artistic material.

> In return for your services set forth hereinabove, you shall be entitled to an on-going fifty (50%) percent of all sums and assets which are recovered as a proximate result of your activities on my behalf pursuant to this agreement.

18.    The 2001 Agreement contained no provision specifying its duration, explicitly or implicitly.

19.    At the time the 2001 Agreement was presented and signed, Ms. Warwick was not represented by counsel. The first time she saw the contract was the day she visited AREC's offices to sign it. It was not negotiated or altered from the original form created by AREC and presented to Ms. Warwick. Upon information and belief, it is essentially the same form AREC uses for all of its other artist clients.

20.    Two months after the 2001 Agreement was signed, AREC submitted a separate one-page document to Ms. Warwick with the heading,  "To Whom It May Concern," which it backdated to November 26, 2001. It was executed on January 9, 2002 (the "Authorization"). It reads as follows:

> ARTISTS RIGHTS ENFORCEMENT CORP. has my authorization to request any and all documents from you, including contracts, licensing agreements, product, financial statements and royalty reports, as an Artist. Also specifically included is the authority to demand. collect and receive, on my behalf, all royalties and other monies found to be due and owing.

21.    To make matters worse, Gabin Rubin, AREC's principal and General Counsel at the time, was the person who notarized Ms. Warwick's signature on the Authorization.

22.     Under New York law, it is generally impermissible for a notary public to notarize a document in which they have a direct or pecuniary interest, as Gabin Rubin did. This principle is grounded in public policy to prevent conflicts of interest and potential fraud. It rendered Ms. Rubin's notarization a nullity.

23.     This incident marked the beginning of a pattern of troubling issues that would continue to define AREC's relationship with Ms. Warwick over the next 23 years.

## DIONNE WARWICK'S RECORDINGS

### The Scepter Records Recordings (1962–1971).

24.     Scepter Records was an important American record label in the 1960s. It helped shape the sound and success of several major pop and soul artists during that era, most especially Ms. Warwick.  Scepter Records success was tied to its relationship with Blue JAC Productions ("Blue JAC"), a production company owned by Burt Bacharach and Hal David, who had discovered Ms. Warwick. Blue JAC played a key role in launching Ms. Warwick's career and in establishing the Bacharach–David songwriting partnership as one of the most successful teams in pop music history.

25.     Blue JAC entered into an agreement with Scepter Records, pursuant to which Blue JAC delivered Ms. Warwick's recordings to Scepter Records, which functioned as Blue JAC's distribution and label partner. They included her recordings of songs written by the Bacharach–David songwriting partnership, including "Walk On By," "Anyone Who Had a Heart," and "I Say a Little Prayer," which became classics and helped define 1960s pop and soul music (the "Scepter Recordings").

26.     By 1975, that relationship imploded when Blue JAC sued Scepter for unpaid royalties. The Blue JAC lawsuit was the key turning point because it blew apart the legal

structure that held Scepter Records together—and that collapse created the opportunity for Ms. Warwick to later reclaim her master recordings.

27.    During the 1970s, the Scepter Records catalogue became the subject of both acquisitions and bankruptcies. In the mid-1970s, Scepter Records filed for bankruptcy and ceased operations. By 1976, Scepter's catalogue was auctioned off and acquired by Springboard International Records. By 1980,  Springboard also went bankrupt and its catalog was sold in part to Gusto Records.

28.    However, Ms. Warwick retained control of her Scepter Recordings during the chaotic collapse of Scepter Records and reacquired her master recordings before the remaining catalog was sold to Gusto Records. At the time, it was extremely rare for an artist to reacquire her master recordings. It was only possible because of Ms. Warwick's stature of one of the most important recording artists of that era. It was one of the earliest examples of a major pop artist regaining master ownership decades before it became common.

**The Warner Bros. Records Era (1971–mid-1970s).**

29.    In 1971, Ms. Warwick signed an exclusive recording artist agreement with Warner Bros. Records, pursuant to which Warner agreed to pay and account to Ms. Warwick record royalties earned from the sale of sound recordings she delivered to Warner (the "Warner Agreement"). Between 1972-1977, Ms. Warwick recorded and delivered to Warner five studio albums entitled "Dionne," "Just Being Myself," "Then Came You," "Track of the Cat " and "Love at First Sight" (the  "Warner Recordings").

30.    In 1990, Warner Special Products, a division of Warner Bros. Records ( "WSMP") acquired the Scepter Recordings from Ms. Warwick and added those to the catalogue of masters embodying Ms. Warwick's classic hits she recorded under the Warner Agreement.

31.     Warner also assumed the obligation to pay and account to Ms. Warwick the royalties that were earned from the sale of the newly acquired Scepter Recordings.

**The Atlantic Records Era (1974).**

32.     In 1974, Ms. Warwick entered into a single-master recording agreement with Atlantic Recording Corporation ("Atlantic"), a sister label for Warner Bros. Records, pursuant to which she recorded the single "Then Came You" (the "Atlantic Recording"). Under that agreement, Atlantic agreed to pay and account to Ms. Warwick record royalties earned from the sale of sound recordings she delivered to Warner  (the "Atlantic Agreement").

**The Arista Records Era (1979–1994).**

33.     In 1978, the legendary Clive Davis recruited Ms. Warwick to join his fledging label, Artista Records ("Arista"). Ms. Warwick signed an exclusive recording artist agreement with Arista pursuant to which Arista agreed to pay and account to Ms. Warwick record royalties earned from the sale of sound recordings she delivered under that agreement (the  "Arista Agreement").

34.     From 1979 to 1994, Arista released twelve studio albums, which included two Grammy winning singles. They marked a major comeback phase in Ms. Warwick's career. Some of  her best-known singles from the Arista era included  "I'll Never Love This Way Again," "Déjà Vu," "No Night So Long," "Heartbreaker," "How Many Times Can We Say Goodbye," "That's What Friends Are For," and  "Love Power" (the "Artista Recordings").

35.     By 2001, Ms. Warwick believed royalties and other income from her Scepter Recordings were not being properly accounted for or paid. Ms. Warwick believed she was not receiving her rightful share of record royalties from Warner for her classic hits released by Scepter Records and Warner.

36. To address this, she hired AREC, which claimed as its specialty royalty recovery and rights enforcement for legacy artists.

37. At the time she signed the 2001 Agreement, Ms. Warwick believed she was only retaining AREC to address the issues she was having with royalty accountings for the Scepter Recordings she made "as a Scepter Records recording artist." At that time, the Scepter Recordings were being distributed by Warner along with the Warner Recordings (collectively, the "Scepter/Warner Recordings").

38. Not having legal counsel at the time, Ms. Warwick assumed that AREC's role would be limited to "the investigation into and collection and/or recovery of any and all royalties and/or other assets which are or may be due and owing to [Ms. Warwick] as a Scepter Records recording artist."

39. However, over the course of the next 25 years, AREC assumed the responsibility of investigating and collecting all forms of income derived from Ms. Warwick's career as an artist, not just royalty income from the Scepter/Warner Recordings and the Artista Recordings, but also royalty income payable to Ms. Warwick from monies collected by Phonographic Performance Limited ("PPL"), a music licensing and royalty collection organization which charges its administrative costs for its services, and SoundExchange ("SoundExchange"), a non-profit organization that collects and pays out digital performance royalties for sound recordings, which charges 4.5%-4.9% of the royalties its collects.

40. AREC did not present Ms. Warwick with separate agreements for this additional work. AREC retained lawyers to handle the work AREC was retained to handle, including a lawyer named Steven Ames Brown. AREC did not have Ms. Warwick enter into separate

retainer agreements with Mr. Brown, even though Mr. Brown held himself out to be Ms. Warwick's attorney on those matters.

41.    The following are AREC so-called achievements it alleges which are the "proximate result" of its  activities.

**The Warner Lawsuit and Settlement.**

42.    <u>First</u>, AREC targeted the Scepter Recordings. AREC has claimed that in 2002 it recommended that Ms. Warwick retain litigation counsel to sue Warner to remedy the purported breach based of Warner's failure to pay Ms. Warwick royalties for the exploitations of the Scepter Recordings and the record "Then Came You."

*43.*    In early 2002, AREC advised Ms. Warwick to retain three separate law firms for that lawsuit, filed in the U.S. District Court  for the Southern District of New York entitled *Warwick v. Warner Products, et al* (Case No. 02-cv-01741-GEL): Strongin Rothman & Abrams, LLP, Locke Lord LLP and Baker & Hostetler LLP, for what was a run of the mill breach of contract case.

44.    In its Complaint in this action, AREC claims that the *Warner Products* case resulted in "years of litigation – paid for by [AREC]."  However, the truth is that while the case was pending for 24 months, nothing significant happened - not one procedural motion and not one substantive motion was filed.  There was no trial.  Instead, Warner and Ms. Warwick entered into a settlement agreement dated March 31, 2004 under which Ms. Warwick was to receive  "some of the royalties that she justly deserved" pursuant to her preexisting recording artist agreements. At AREC's insistence, that settlement agreement provided that the record company was required to send all future royalty statements and payments due Ms. Warwick to AREC.

45.    Upon information and belief, that lawsuit did not result in any improvements or other new benefits to the preexisting terms of the 1971 Warner Agreement.

46.    AREC claims that the legal fees incurred for that lawsuit were  "paid for by [AREC]," but the truth is that whatever legal fees AREC might have advanced were paid for with Ms. Warwick's royalties, meaning they were recouped by AREC from the monies paid by Warner on behalf of Ms. Warwick under the settlement.

47.    For the past 20 years, Warner has been remitting all of Ms. Warwick's royalties directly to AREC and sending AREC any royalty statements for the relevant accounting periods.

48.    For those 20 years of royalties, for which AREC has taken at least a 50% commission, all AREC did was recommend the law firms that actually handled the litigation and negotiated the settlement agreement.

**The 2017 Arista/Sony Matter.**

49.    <u>Next</u>, AREC asserts that in 2017, "Ms. Warwick requested that Artists Rights determine why she was no longer receiving royalty statements for the records she recorded for Arista Records." AREC allegedly "investigated the issue" and, first, determined that Sony (by then the owner of Arista) had the wrong remittance address for Ms. Warwick and, second, that the State of California had exercised a tax lien on those Sony royalties to pay taxes Ms. Warwick owed the state.

50.    In order to rectify those issues, AREC asserts that it used  "considerable efforts" to do two things: (a) get the tax lien lifted, and (2) provide Sony with the correct address for remittance of Ms. Warwick's royalties.

51.   AREC claims that those two fixes were the "proximate result" of its efforts, and "[f]or this work, Ms. Warwick agreed that [AREC] would receive a 50% share of the royalties recovered from Sony as a proximate result of [AREC'] efforts."

52.   In April 2017, as part of AREC's strategy relating to Sony, Mr. Ames served Sony Termination Notices under § 203 of the Copyright Act signed by Chuck Rubin as  "[Warwick's] duly authorized agent," the purpose of which was to obtain a reversion of the United States copyrights in all of the Arista Recordings, or to at least to use § 203 as leverage to improve the royalty terms of Ms. Warwick's 1978 Arista Agreement.

53.   When AREC's  lie is unmasked, those so-called achievements were actually the result skilled tax advisers retained by Ms. Warwick to remove the lien and Ms. Warwick paying her back taxes herself, and AREC providing Sony with an address for remittance of her record royalties and statements – and even then not Ms. Warwick's address, but AREC's.

54.   The efforts of Mr. Ames and the § 203 leverage was, as alleged, completely wasted. By April 2019, a full two years after they were served, Sony advised Mr. Ames that the Termination Notices were ineffective because of numerous technical deficiencies. AREC claimed it tried to negotiate an amendment to Ms. Warwick's 1978 Arista Agreement. However, AREC once again dropped the ball and never negotiated or finalized anything, even though AREC later falsely claimed it did improve the royalty rates in the old agreement. As a result, Ms. Warwick's never received any benefit she might have, and should have, obtained from the aborted § 203 termination threat.

55.   In the end, AREC's efforts did not include renegotiating Ms. Warwick's decades-old and outdated recording artist agreement with Arista. That did not occur until many years later

in 2025 when Ms. Warwick retained competent music attorneys to negotiate better terms with Sony.

56.    For whatever "achievements" AREC claimed it obtained, since at least 2017 – which by all appearances were nothing  –  AREC has been taking at least a 50% commission from Ms. Warwick's royalties earned on all of her Arista Recordings.

**The 2021 Rhino Settlement.**

57.    <u>Next</u>, AREC boasts that in 2021 it resolved a dispute between Ms. Warwick and Rhino Entertainment Company ("Rhino"), successor-in-interest to Warner Special Products Inc., under a 1990 agreement relating to third party synchronization licenses issued by Rhino for certain Scepter Recordings that were used in promos or trailers for theatrical motion pictures and television programs.

58.    According to AREC, it secured  "yet another advantageous settlement agreement with respect to the Scepter Masters from [Rhino]" by amending the 1990 agreement. Pursuant to that amendment, Rhino paid AREC a "settlement payment" of $143,000 and agreed that on or after April 1, 2021, it would apply new royalty rates for digital transmissions and  "streams " and digital downloads for the synchronization issues at issue (the  "<u>2021 Rhino Settlement</u>").

59.    The 2021 Rhino Settlement did not provide that any of those improved digital royalties be paid to AREC, but AREC nevertheless instructed Rhino/Warner to render all accounting statements and remit all payments for such digital royalties directly to AREC instead of Ms. Warwick.  Since then, AREC has collected those digital royalties and applied the same 50% commission.

**<u>AREC has collected Ms. Warwick's royalties for the past 23 years</u>**.

60.    From 2002 through 2025, AREC has collected and deposited into its own bank account all of Ms. Warwick's royalty income, including without limitation, royalties payable from the exploitation of the Scepter/Warner Recordings (from 2002 to 2025) and the Artista/Sony Recordings (from 2017 to 2025), and applied the commission structure set forth in the 2001 Agreement to all such income, not just for the initial work it did regarding the Scepter Recordings, charging Ms. Warwick a staggering 50% commission on all of that royalty income the entire time, which resulted in a windfall to AREC which is believed to be in the millions of dollars in the aggregate, the precise amount of which is presently unknown to Ms. Warwick.

61.    As for PPL and SoundExchange income, for what turned out to be routine administrative work, AREC has been collecting and taking a 25% commission on all such income.

62.    During all relevant time periods, AREC exercised complete dominion over Ms. Warwick's royalty income and accountings, including instructing Warner/Atlantic, Arista  and, by 2004, Sony Music Entertainment ("<u>Sony</u>"), which by then had gained control of Arista Records. AREC instructed all of those record companies to send all statements of account directly to AREC and pay all of Ms. Warwick's royalty income to AREC.

63.    During all relevant time periods, AREC never prepared or rendered any accounting statements to Ms. Warwick for that royalty income and did not even bother to forward to Ms. Warwick copies of the accounting statements it received from any of those record companies or collection agents.

64.    AREC and Ms. Warwick did not enter into separate, discrete written commission agreements signed by Ms. Warwick for any of the collection work AREC claims it performed for Ms. Warwick over the years.

65.    Ms. Warwick believed the 50% commission provided for in the 2001 Agreement was limited to the Scepter Recordings and the initial unpaid royalties recovered after AREC was hired in 2001, but not the collection of all such royalties in perpetuity.

66.    Whatever commission AREC might have been entitled to under the 2001 Agreement is debatable but, at most, it is expressly limited to all sums and assets which are recovered *as a proximate result* of AREC's activities on Ms. Warwick's behalf, but not more than the fair value of those services.

67.    In a profound failure of the transparency required of AREC as Ms. Warwick's fiduciary, with rare exceptions, AREC's communications with Ms. Warwick over that 20-plus year period never included the kind of detail required of a fiduciary concerning the amounts being to AREC, copies of any the statement of account rendered to AREC by those third party payees, or  the calculations necessary to understand  costs of collection, including the percentage cut AREC was keeping for itself.

68.    AREC never explained to Ms. Warwick what it did to warrant a commission of any kind, no less a 50% cut, such as the nature of the work it directly performed, the nature of the work the attorneys it hired performed,  and how "sums and other assets that [were] recovered" were the proximate result of its activities.

69.    AREC assumed, incorrectly, that the 2001 Agreement governed any and all such work, not merely "royalties and other assets which are or may be due and owing…" for the Scepter Recordings, and whether or not any recovery was the proximate result of the rights Ms.

Warwick had under her preexisting recording agreements. Instead, for 23 years AREC took a 50% share of *anything and everything* that flowed as a result of her creative output from 1962 to 2001.

70.    AREC unilaterally determined that the commission that AREC would receive was the "on-going 50% percent" amount of all such royalties and other assets, without regard to whether any such recoveries were the "proximate result" of AREC's efforts.

71.    AREC's Complaint in this action grossly exaggerates the work it performed and the results it obtained for Ms. Warwick. It is full of self-aggrandizing statements designed to inflate its purported contributions and justify the unmerited windfall of millions of dollars to which it was not entitled.

72.    When you strip away the illusion manufactured by AREC and expose the lie, AREC's efforts were at best nothing more than administrative in nature, or activities that music lawyers routinely perform for an hourly fee.

73.    Further, the decades long windfall AREC received at Ms. Warwick's expense was not based on the proximate result of its efforts and was materially disproportionate to the fair value of those services.

74.    The total amount of the commissions taken by AREC relating to the Warner/Atlantic Recordings and the Arista/Sony Recordings — representing the most significant creative output from Ms. Warwick's storied career — is presently unknown to Ms. Warwick but is believed to be in the millions of dollars.

**The Termination of the 2001 Agreement**.

75.    In the Fall 2025, Ms. Warwick retained the services of the Davis Firm, experienced music business lawyers. The Davis Firm immediately set out to obtain a complete set of AREC's files relating to Ms. Warwick.

76.    On September 15, 2025, the Davis Firm wrote to Gabin Rubin requesting that AREC provide them with a complete set of their files relating to Ms. Warwick, including anything that AREC believed expanded the scope of the 2001 Agreement beyond the initial collection work for the unpaid Scepter Recordings royalties, as well as any other documents that would be applicable to non-Scepter Recording royalties.

77.    That same day, Ms. Rubin transmitted to the Davis Firm a handful of documents which did not remotely reflect the work AREC supposedly performed for Ms. Warwick over the preceding 23 years. They included  a copy of the 2021 Rhino Settlement, a March 10, 2024 Letter indicating a courtesy reduction of SAG/AFTRA vocal consent fees;  a PPL packet establishing Ms. Warwick as a performer in order to collect royalties beginning in 2013; a "Sony Music royalties packet indicating AREC's work beginning in 2017"; and the §203 Termination Notices and Sony's 2019 response to same.  Conspicuously, they did not include the historical royalty statements or accountings setting forth all the monies AREC had collected over the years.

78.    On September 16, 2025, the Davis Firm sent AREC written notice that Ms. Warwick was terminating the 2001 Agreement  "to any extent it is enforceable by law" (the "Termination Letter").

79.    The Termination Letter stated *inter alia* as follows: (a) it clarified that the scope of the 2001 Agreement, to the extent it was enforceable at all, was limited to the Scepter Recordings; (b) demanded that AREC immediately cease all collections of future monies on Ms.

Warwick's behalf, (c) demanded that AREC inform any and all third parties that AREC is no longer authorized to collect any monies on Ms. Warwick's behalf, (d) demanded that AREC direct all such third parties to render any and all future payments to Ms. Warwick directly, and (e) demanded that AREC provide copies of all royalty statements and other statements of account rendered to AREC on Ms. Warwick's behalf, along with any supporting documentation in connection therewith.

80.    On September 26, 2025, AREC's litigation counsel emailed the Davis Firm in response to the Termination Notice. Among other things, and remarkably, AREC's counsel questioned the Davis Firm's demand that AREC provide them with copies of any royalty accountings or statements rendered by third parties to AREC in connection with Ms. Warwick, stating, "[U]nder what basis does Ms. Warwick have a right to an accounting? I did not see a provision in the [2001] Letter Agreement for an accounting; on what basis does Ms. Warwick's right to an accounting under that contract arise?"

81.    This response finally has revealed the fundamentally untenable position AREC has adopted with respect to its legal and business relationship with Ms. Warwick. It exposed the fact that AREC has and would continue to completely disregard the nature of its role as Ms. Warwick's fiduciary.

82.    AREC  has failed or refused to provide the documents essential for Ms. Warwick to fully understand the activities AREC has undertaken on her behalf for the past 23 years, and the materials that AREC has asserted purportedly justifies its claim to 50% of the monies generated from Ms. Warwick's creative output and the governing agreements, all of which predated AREC's involvement.

83.    In short, AREC has failed or refused to provide Ms. Warwick the full disclosure and transparency that is at the core of AREC's role as agent and fiduciary.

84.    Rather than addressing the reasonable demands made by Ms. Warwick's counsel or offering any justification for its numerous defalcations, AREC instead chose to initiate this litigation against Ms. Warwick.

### FIRST COUNTERCLAIM
**(Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*
Declaring that the 2001 Agreement was validly terminated because it lacks duration)**

85.    Counterclaimant repeats and realleges each and every allegation set forth in paragraphs 1 through 84 hereof with the same force and effect as if fully set forth herein.

86.    Pursuant to 28 U.S.C. §2201, this Court may declare the rights and other legal relations of any interested party seeking such declaration whether or not further relief is, or could be, sought.

87.    Counterclaimant Dionne Warwick seeks a declaratory judgment to determine the validity of the termination of the 2001 Agreement effective as of September 16, 2026.

88.    The 2001 Agreement, which provided that AREC " investigate and recover" royalties on behalf of Ms. Warwick in exchange for an  "on-going fifty (50%) percent" commission, was validly terminated because it lacked any provision as to its duration or term relating to AREC's services or commission. It is therefore presumed to be terminable at will under applicable law.

89.    AREC has maintained that the use of the term "on-going" means that the 50% commission applies to all recoveries made as a result of AREC's activities, without no time limitation or end date for the entitlement, thus suggesting a perpetual right to the 50% percentage of recovered sums and assets.

90.    Under New York law, contracts for services that do not include a specific provision for duration are presumed to be terminable at will. The 2001 Agreement is one such contract for services.

91.    At no time did Ms. Warwick ever agree that AREC's appointment as her agent was irrevocable or that the commission was to be perpetual, including without limitation, in the 2001 Agreement itself.

92.    For all of the matters AREC was involved with relating to Ms. Warwick, each matter related to the investigation and recovery of royalties already payable to Ms. Warwick under artist agreements that pre-dated AREC's retention by Ms. Warwick or preexisting sound recordings made by Ms. Warwick long before 2001. At no time did AREC ever receive or acquire title to or an ownership or proprietary interest in the subject matter of those agreements or copyrights themselves.

93.    Under New York law, an agent's authority to collect a debt or to settle a claim is not a power coupled with an interest and is revocable by the principal.

94.    That is precisely what the Appellate Court held in another lawsuit brought by AREC against one of its artist clients to enforce as "irrevocable" an agency agreement that was nearly identical to the 2001 Agreement: "[P]laintiff's agreement with musical artists…was not irrevocable as an agency coupled with an interest because consideration alone [*i.e.*, assumption of a legal fee obligation] is not sufficient to establish an agency coupled with interest." *Artist Rights Enforcement Corp. v. Joseph Robin, et al,* 192 A.D.3d 573  (1st Dep't 2021).

95.    On or about September 16, 2025, Ms. Warwick provided written notice to AREC terminating the 2001 Agreement with immediate effect.

96.    AREC maintains that it has a business interest in the property or transactions it has overseen as Ms. Warwick's agent and has misconstrued its limited role as her fiduciary by confusing it as though it were her partner.

97.    AREC has disputed the validity of the termination and has continued to assert rights under the 2001 Agreement, creating an actual controversy between the parties.

98.    Under 28 USCS § 2201, a declaratory judgment is appropriate where there is an actual controversy between parties having adverse legal interests, of sufficient immediacy and reality to warrant judicial intervention.

99.    The controversy between Ms. Warwick and AREC is substantial, immediate, and real, as AREC has challenged Ms. Warwick's termination of the 2001 Agreement and continues to assert rights under that agreement.

100.    The 2001 Agreement is presumed to be terminable at will under New York law because it lacks any provision as to its duration.

101.    Ms. Warwick's termination of the 2001 Agreement was therefore valid and effective as a matter of law.

102.    Ms. Warwick demands judgment herein declaring the rights and other legal relations of the parties with respect to the 2001 Agreement, and that the declaratory judgment specify that the 2001 Agreement is terminated as of September 16, 2025.

103.    Ms. Warwick's has no adequate remedy at law.

### SECOND COUNTERCLAIM
**(Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*.**
**Declaring that the 2001 Agreement was validly terminated**
**because it involved the rendering of services by lawyers)**

104.    Counterclaimant repeats and realleges each and every allegation set forth in paragraphs 1 through 103 hereof with the same force and effect as if fully set forth herein.

105.  AREC was retained by Ms. Warwick under the 2001 Agreement to investigate and recover royalties owed to Ms. Warwick from the exploitation of the Scepter Recordings.

106.  The principal person who rendered the services under the 2001 Agreement was Gabin Rubin, an attorney licensed to practice law in the State of New York since 1995.

107.  Since as early as 2001 and continuing to the present, Ms. Rubin has been an officer, owner, and general counsel of AREC, including the entre time AREC has claimed to operate as Ms. Warwick's agent.

108.  The 2001 Agreement required AREC to perform services that included, but were not limited to, investigating royalty payments, negotiating with third parties, and potentially preparing or reviewing legal documents.

109.  Ms. Rubin rendered those services to Ms. Warwick and, in exchange, AREC has claimed entitlement to compensation in the amount of a commission of 50% in perpetuity of all sums and assets which were recovered as a proximate result of her activities on Ms. Warwick's behalf.

110.  In addition to Ms. Rubin rendering such services, during a 15-year period starting in 2011,  AREC retained the legal services of attorney Steve Ames Brown and, at AREC's direction and under its control, Mr. Brown purported to represent and did represent the interests of  Ms. Warwick.

111.  Mr. Brown was never separately retained by Ms. Warwick.

112.  The 2001 Agreement, by its terms and by virtue of the nature of the services actually rendered by Ms. Rubin and other lawyers she hired to represent Ms. Warwick, involved the performance of legal and/or business services no different than what every music lawyer routinely

performs for his or her clients, such as investigating the client's legal rights and the violation of same by third parties, negotiating legal rights and preparing legal documents.

113.  Under New York law, a New York attorney who operates a commercial business rendering business advice remains subject to the New York Rules of Professional Conduct and the ethical obligations imposed on attorneys. AREC was such a business. The ethical rules governing attorneys in New York apply regardless of whether the attorney is engaged in traditional legal practice or other professional or business activities.

114.  As a matter of public policy, under New York law, every agreement for the rendition of services by an attorney contains an implied condition that the client may terminate the attorney-client relationship at any time, without explanation, with or without cause.

115.  Under New York law, the lawyer who is discharged without cause is entitled only to *quantum meruit* recovery against the client to the extent that the fair and reasonable value of legal services can be established. The lawyer has no cause of action for breach of contract but must pursue recovery of its fees on *quantum meruit* grounds for services previously rendered.

116.  Ms. Warwick exercised her absolute right to terminate the 2001 Agreement, as the services contemplated therein required the performance of legal services and/or the business services of an attorney. Since Ms. Warwick no longer wished to retain AREC for such services, such termination as lawful.

117.  To the extent that AREC rendered any services through the efforts of Gabin Rubin or Steven Ames Brown, it is entitled to no more than a *quantum meruit* recovery rather than the perpetual 50% commission it claims it is entitled to in the Complaint.

118.  A bona fide justiciable controversy exists between the parties as to the validity of the termination of the 2001 Agreement and the compensation AREC might be entitled to (if any), as

AREC has disputed Ms. Warwick's right to terminate the 2001 Agreement and/or has sought to enforce the 2001 Agreement despite its termination.

119.  Ms. Warwick's termination of the 2001 Agreement was therefore valid and effective as a matter of law.

120.  Ms. Warwick demands judgment herein declaring the rights and other legal relations of the parties with respect to the 2001 Agreement, including a declaration that (a) Ms. Warwick had the absolute right to terminate the 2001 Agreement at any time, with or without cause, as a matter of public policy, and (b) that the declaratory judgment specify that the 2001 Agreement is terminated as of September 16, 2025, and (c) that any compensation to which AREC might be entitled for whatever past services AREC rendered through Ms. Rubin or Mr. Ames is limited to *quantum meruit* recovery to the extent that the fair and reasonable value of legal services can be established.

121.  Ms. Warwick's has no adequate remedy at law.

### THIRD COUNTERCLAIM
**(Breach of Fiduciary Duty)**

122.  Counterclaimant repeats and realleges each and every allegation set forth in paragraphs 1 through 121 hereof with the same force and effect as if fully set forth herein.

123.  AREC, as Ms. Warwick's fiduciary for the past  23 years, and Ms. Rubin, as an attorney and AREC's principal and General Counsel, also owed Ms. Warwick a fiduciary duty, a status which arose as a matter of law since the intimacy between the parties far exceeded that of a mere commercial or contractual relationship. Out of that long enduring relationship was born a special relationship of trust and confidence between the parties and thus a fiduciary relationship existed independent of any contractual duties.

124. Those fiduciary and ethical obligations include undivided loyalty, candor, full disclosure, and complete transparency; they require that AREC act free from conflicts of interest and without regard to personal gain.

125. When AREC, as Ms. Warwick's agent, placed its own interests above Ms. Warwick's interests, the law calls that what it is: a breach of fiduciary duty. That is what has occurred here.

126. AREC breached its fiduciary duty when, among other things, it did or omitted to do the following:

a)    It failed to follow up the § 203 Termination Notices for two years after they were served, and thereafter in 2019 once Sony had rejected them on technical grounds;

b)    it failed to take advantage of any leverage the § 203 Termination Notices might have provided Ms. Warwick by renegotiating the original Artista Agreement with Sony;

c)    it falsely represented to Ms. Warwick that it had improved the royalty terms of the original 2017 Arista Agreement, thus causing Ms. Warwick to lose additional royalty income from the Arista Recordings for the past six years;

d)    it failed and/or refused to render accounting statements to Ms. Warwick for the past 23 years showing the royalty income AREC was paid by the various record companies that had been exploiting the Warwick Recordings;

e)    it failed and/or refused to provide Ms. Warwick with copies of any accounting statements rendered to AREC for the past 23 years that it had received from the various record companies that had been exploiting the Scepter/Warner Recordings and the Arist/Sony Recordings;

f)    it failed to conduct regular audits of any statements of account rendered by those record companies, thereby causing Ms. Warwick to waive any contractual audit rights to allow inspection of the record companies' books and records relating to those royalty statements;

g)    it failed to report and account for all monies it collected on behalf of Ms. Warwick;

h)    it failed to maintain proper records of all amounts collected by AREC and/or to provide Ms. Warwick with a transparent accounting of receipts and disbursements, ensuring that all funds paid to AREC are disclosed and traceable;

i)    it improperly applied a 50% commission for the past 23 years on any and all royalty or other income paid to AREC in connection with any non-Scepter Recordings, or for Scepter Recordings beyond the initial investigation into unpaid royalties due Ms. Warwick for the Scepter Recordings as of 2002;

j)    it improperly applied a 50% commission for the past 23 years on any and all royalty or other income paid to AREC in connection with the Scepter/Warner Recordings and the Arista/Sony Recordings, which were recovered but not the proximate result of AREC's activities;

k)    in 2025, after Ms. Warwick instructed Warner and Sony to render all future statements of account and make all royalty payments to her instead of AREC, upon information and belief, AREC improperly contacted both Sony and Warner to direct them to ignore Ms. Warwick's instructions and to continue to pay and account to directly to AREC;

l)    in September-October 2025, in an overt attempt to interfere with a potential sale by Ms. Warwick to Primary Wave of the revenue streams from her sound recordings, AREC's representatives contacted Primary Wave to advise them that AREC had a copyright interest in Ms. Warwick's catalog and was not willing to sell Primary Wave AREC's purported copyright

interests, and that AREC "owned" 50% of the catalogue's royalty streams and had a "right to a percentage of some of those revenue streams," and thus Ms. Warwick had no right to sell the entire interest;

m) Gabin Runin improperly notarized Ms. Warwick's signature on the Authorization, which is against public policy, and was part on a decades long pattern of blatant conflict of interest and self-dealing, whereby AREC placed its own interests over Ms. Warwick's.

127. AREC's 20-year exercise of dominion over the receipt of royalty statements and payments, combined with its failure to provide Ms. Warwick with any accountings or copies of statements, concealed the scope of its conduct, and prevented Ms. Warwick from discovering the wrongful commissions being taken.

128. At all relevant times, AREC owed Ms. Warwick the highest duties of loyalty, care, and faithful representation. Rather than honoring those obligations, AREC abandoned its fiduciary role and conducted itself as though it were a partner in the underlying transactions it handled for Ms. Warwick.

129. At all relevant times, instead of exercising independent fiduciary judgment on Ms. Warwick's behalf, AREC blurred the distinction between fiduciary and partner, disregarding its duty to act solely on behalf of Ms. Warwick, thereby breaching its fiduciary duties.

130. Ms. Warwick's has been damaged by reason of the aforesaid breaches of fiduciary duty in an amount to be determined at trial.

131. In addition, because AREC's conduct was intentional and/or willful, Ms. Warwick is entitled to punitive damages.

## FOURTH COUNTERCLAIM
### (Fraud/Fraud by Omission)

132.  Counterclaimant repeats and realleges each and every allegation set forth in paragraphs 1 through 131 hereof with the same force and effect as if fully set forth herein.

133.  In performing the aforementioned acts and omissions, AREC was compromising its fiduciary role as agent for Ms. Warwick, for the benefit of AREC.

134.  As a fiduciary of Ms. Warwick, AREC owed a duty of undivided loyalty including, *inter alia,* an affirmative duty to disclose to Ms. Warwick all relevant and pertinent facts that could have any bearing on, or might otherwise influence, Ms. Warwick's decisions in respect of the transactions at issue.

135.  This affirmative duty of disclosure included, without limitation, a duty to fully disclose to Ms. Warwick the import and effect of the Authorization notarized by Gabin Rubin and the fact that it benefited AREC and not Ms. Warwick; the details pertaining to any and all statements of account rendered by third party record companies and collection agents; the terms and conditions of any settlement agreements with third party record companies that AREC supervised or was involved with, including the fact that AREC inserted provisions for direct payments to AREC of any advances or royalties payable for the benefit of Ms. Warwick; the amounts paid to AREC by the record companies and collection agents; the fact that AREC hired attorneys to work on matters effecting Ms. Warwick's legal and business interests and the work performed by those attorneys without ever disclosing same to Ms. Warwick; the amount and manner in which AREC was calculating the commissions it retained for itself; and of all other matters in which AREC was involved on behalf of Ms. Warwick.

136.  AREC's failure to disclose such material and relevant facts was intended to influence and induce Ms. Warwick in respect of the transactions at issue.

137.  Ms. Warwick justifiably believed that AREC was looking out for her best interests and relied on that belief when she signed those settlement agreements with third party record companies.

138.  AREC's conduct as aforesaid constitutes actionable fraudulent concealment and omission.

139.  As a result thereof, Ms. Warwick has been damaged by reason of the aforesaid fraud by omission in an amount to be determined at trial.

140.  In addition, because AREC's conduct was intentional and/or willful, Ms. Warwick is entitled to punitive damages

## FIFTH COUNTERCLAIM
### (Breach of Contract)

141.  Counterclaimant repeats and realleges each and every allegation set forth in paragraphs 1 through 140 hereof with the same force and effect as if fully set forth herein.

142.  Under the 2001 Agreement, AREC was obligated to properly pay Ms. Warwick all sums and assets which are recovered as a proximate result of AREC's activities on her behalf, after deducting only the agreed commissions for whatever services were rendered.

143.  As agent for Ms. Warwick, AREC had an implied duty to render an accurate accounting for monies collected on her behalf. This duty arises from the fiduciary relationship between AREC, as agent. and Ms. Warwick, as principal. AREC was thus obligated to provide Ms. Warwick with an accurate and complete accounting of all royalties and other amounts it collected, including itemized details of principal, legal fees, commissions, and other charges.

144.  Moreover, that fiduciary relationship itself inherently gives rises to the requirement that AREC disclose any and all dealings it oversaw and handled relating to Ms. Warwick's legal and business interests.

145.  AREC materially breached those duties and failed or refused to cure any of those breaches.

146.  As a proximate result of the foregoing material breaches and other defalcations, Ms. Warwick's has been damaged duty in an amount to be determined at trial, including punitive damages.

## SIXTH COUNTERCLAIM
### (Equitable Accounting)

147.  Counterclaimant repeats and realleges each and every allegation set forth in paragraphs 1 through 146 hereof with the same force and effect as if fully set forth herein.

148.  AREC breached its legal duties to Ms. Warwick by failing to render accurate and complete accountings of all royalties and other amounts it collected on Ms. Warwick's behalf.

149.  Ms. Warwick has demanded an accounting from AREC, and AREC has refused to provide such accounting for all royalties and other amounts it collected on Ms. Warwick's behalf.

150.  AREC's failure to properly account to Ms. Warwick has caused  her to be injured.

151.  Ms. Warwick is without knowledge of the exact amounts collected by AREC on her behalf and cannot obtain such knowledge or ascertain the exact amount of such monies without a detailed accounting from AREC, which has sole and exclusive knowledge thereof.

152.  Ms. Warwick is entitled to an order of this Court directing AREC to provide an accurate accounting which specifies in complete detail the information and documents, including, without limitation, all related contracts concerning all royalties and other amounts it collected on Ms. Warwick's behalf, which are necessary for an audit of his books and records relating thereto.

153.  Furthermore, Ms. Warwick demands that AREC make immediate and appropriate payments to her for any and all deficiencies established as a result of that accounting, in an amount to be determined at trial, but in no event less than the jurisdictional limit of this Court.

154.  Ms. Warwick has no adequate remedy at law.

## SEVENTH COUNTERCLAIM
### (Tortious Interference with Prospective Business Relations)

155.  Counterclaimant repeats and realleges each and every allegation set forth in paragraphs 1 through 154 hereof with the same force and effect as if fully set forth herein.

156.  AREC was aware of Ms. Warwick's ongoing negotiations with Primary Wave during the fall of 2025, pursuant to which Ms. Warwick's representatives were discussing an agreement for the potential sale to Primary Wave of the revenue streams from Ms. Warwick's sound recordings.

157.  In September and October 2025, AREC's representatives contacted Primary Wave and falsely represented to them that AREC owned a copyright interest in Ms. Warwick's catalog and was not willing to sell Primary Wave AREC's purported copyright interests, that AREC "owned" 50% of the catalogue's royalty streams and that AREC had a "right to a percentage of some of those revenue streams."

158.  AREC's representatives also told Primary Wave that Ms. Warwick did not have the right to sell more than 50% of those royalty streams and that any deal she was discussing with Primary Wave would be limited to that amount.

159.  AREC's representatives also told Primary Wave that AREC was open to receiving offers to sell the purported 50% share of those royalties, for AREC's sole benefit and to the exclusion of Ms. Warwick.

160.  AREC, having been motivated by of being "cut out" of any deal Ms. Warwick might have made with Primary Wave, undertook and implemented a course of conduct designed to destroy or damage Ms. Warwick prospective business opportunity with Primary Wave.

161.  As a result thereof, Ms. Warwick has been damaged by reason of the foregoing in an amount to be determined at trial.

162.  In addition, because AREC's conduct was intentional and/or willful, Ms. Warwick is entitled to punitive damages.

### EIGHTH COUNTERCLAIM
#### (Unjust Enrichment)

163.  Counterclaimant repeats and realleges each and every allegation set forth in paragraphs 1 through 162 hereof with the same force and effect as if fully set forth herein.

164.  It would be against equity and good conscience to permit AREC to retain the benefits that they have realized at Ms. Warwick's expense.

165.  Based on the facts described herein, AREC has been unjustly enriched at Ms. Warwick's expense in an amount in an amount to be determined at trial.

### PRAYER FOR RELIEF

**WHEREFORE,** Counterclaimant Dionne Warwick requests judgment as follows:

A.    Dismissal of each individual Count of the Complaint in part and/or in their entirety;

B.    On the First Counterclaim, a judicial declaration establishing the rights and legal relations of the parties, declaring the rights and other legal relations of the parties under the 2001 Agreement, including that the declaratory judgment specify that the 2001 Agreement was terminated as of September 16, 2025;

C.    On the Second Counterclaim, a judicial declaration establishing the rights and legal relations of the parties, declaring the rights and other legal relations of the parties under the 2001 Agreement, including that the declaratory judgment specify that the 2001 Agreement was terminated as of September 16, 2025;

D.    On the Third Counterclaim, awarding Ms. Warwick's damages in an amount to be determined at trial, as well as punitive damages in an amount no less than $1,000,000.00;

E.    On the Fourth Counterclaim, awarding Ms. Warwick's damages in an amount to be determined at trial, as well as punitive damages in an amount no less than $1,000,000.00;

F.    On the Fifth Counterclaim, awarding Ms. Warwick's damages in an amount to be determined at trial;

G.    On the Sixth Counterclaim, an order of this Court directing AREC to provide an accurate accounting which specifies in complete detail the information and documents, including, without limitation, all related contracts concerning all royalties and other amounts it collected on Ms. Warwick's behalf, which are necessary for an audit of his books and records relating thereto, and ordering that AREC make immediate and appropriate payments to her for any and all deficiencies established as a result of that accounting;

H.    On the Seventh Counterclaim, awarding Ms. Warwick's damages in an amount to be determined at trial, as well as punitive damages in an amount no less than $1,000,000.00;

I.    On the Eighth Counterclaim, awarding Ms. Warwick's damages in an amount to be determined at trial;

J.    Awarding Ms. Warwick interest, costs and reasonable attorney's fees as permitted by law or statute; and

K.    Awarding Ms. Warwick such other and further relief as this Court deems just and proper.

Dated: March 9, 2026

Yours, etc.

MELONI & McCAFFREY LLC

By: _____
      Robert S. Meloni

3 Columbus Circle, 15th Floor
New York, New York 10019
Email: rmeloni@m2lawgroup.com
Tel: (917) 331-9556

*Attorneys for Defendant Dionne Warwick*